

# IN THE MISSOURI COURT OF APPEALS
# WESTERN DISTRICT

FANGO, LLC AND
IMANI BUTLER,

       Appellants,

v.

DOUGLAS M. JACOBY AND
JOHN R. ASHCROFT,

      Respondents.

)
)
)
)
)
)
)
)
)
)
)
)
)
)

WD86051

OPINION FILED:
August 13, 2024

**Appeal from the Circuit Court of Cole County, Missouri
The Honorable Jon Beetem, Judge**

**Before Division One:** Edward R. Ardini, Jr., Presiding Judge, Mark D. Pfeiffer and
Cynthia Martin, Judges

## Introduction

Fango, LLC ("Fango"), and Imani Butler ("Butler") (collectively "Appellants")

appeal the judgment of the Circuit Court of Cole County, Missouri ("circuit court"),

affirming the decision of the Commissioner of Securities ("the Commissioner")[1] finding

---

[1] Mr. Jacoby and Mr. Ashcroft are named as parties in this appeal in their official capacities as the Commissioner of Securities and Secretary of State respectively.

that Appellants committed three violations of section 409.5-501[2] of the Missouri Uniform Securities Act based on an administrative petition filed by the Enforcement Section of the Missouri Securities Division ("Enforcement Section"). We affirm.

**Procedural History and Facts[3]**

On August 23, 2020, the Enforcement Section received a complaint via its website from Missouri Resident ("MR").  MR generally alleged that Butler and Fango defrauded him of his investment in Fango.  The Enforcement Section initially filed an administrative enforcement petition against Appellants with the Commissioner of Securities on April 2, 2021, before filing an amended enforcement petition ("the Petition") on April 12, 2021.

The Petition alleged facts supporting ten violations of section 409.5-501 and sought injunctive relief; civil penalties; restitution of $59,550 plus annual interest at a rate of eight percent per annum; and costs relating to the investigation.  On April 16, 2021, the Commissioner issued an order to cease and desist and an order to show cause why restitution, civil penalties, costs, and other administrative relief should not be imposed. On October 19, 2021, the Enforcement Section and Appellants submitted joint stipulated facts and evidence to the Commissioner.  On October 26, 2021, the Commissioner

---

[2] All statutory references are to THE REVISED STATUTES OF MISSOURI 2016, as supplemented.

[3] "In reviewing an agency's findings of fact, this Court defers to the agency's credibility determinations and the weight given to conflicting evidence.  This Court will defer to an agency's factual findings so long as there is sufficient competent and substantial evidence in the record to support them and they are not contrary to the overwhelming weight of the evidence."  *Ferry v. Bd. of Educ. of Jefferson City Pub. Sch. Dist.*, 641 S.W.3d 203, 206 (Mo. banc 2022) (internal citations omitted).

convened a hearing. The parties presented documentary evidence and testimony from MR, Butler, and an investigator from the Enforcement Section.

On February 2, 2022, the Commissioner issued findings of fact, conclusions of law and final order to cease and desist and an order awarding restitution, civil penalties and costs ("the Order"). In the Order, the Commissioner issued sixty findings of fact based on the testimony of the witnesses, the joint stipulation, and admitted exhibits. The competent and substantial evidence of the whole record supported the following findings relevant to this appeal:

Fango is a limited liability company that was registered with the Missouri Secretary of State on August 19, 2013. Fango was founded by Butler for the purpose of creating a website and corresponding mobile app to facilitate interactions between fans and celebrities, such as professional athletes and musicians. Fango intended to generate revenue through subscription fees paid to the website or app from member fans seeking celebrity interaction.

In July of 2015, MR met with Butler to discuss the possibility of investing in Fango. On August 13, 2015, another Fango employee followed up by emailing MR a "Business Summary" and a draft operating agreement which MR viewed as "a prospectus for the Fango opportunity." The Business Summary stated Fango was seeking "[s]eed [r]ound funding of $50,000 for the development of the social media site and initial program development." The Business Summary further stated Fango was "seeking funds only from experienced and certified investors" and that the risk should be viewed as very high.

The Business Summary named several celebrities Fango was planning to recruit to join Fango, including prominent celebrities like Taylor Swift, Beyoncé, Jay-Z, and Lebron James, as well as several lesser-known celebrities. The Business Summary stated that MR's $50,000 investment would be allocated as follows: $25,000 for development of the website and mobile app, $22,500 for sales and marketing, and $2,500 for legal fees.

During their initial dealings, Butler represented to MR that agreements with the targeted celebrities were in progress, stating that Fango was "working on getting agreements with [them]." MR took this statement to mean that "there were probably some agreements ready to go." As a further inducement to invest, MR was told in an August 13, 2015 email that revenue would be generated within 120 days of receipt of MR's full investment "or basically before the end of 2015." This inducement was also contained in the Business Summary which claimed that Fango "plans on generating revenue . . . within 120 days of funding." MR was further promised that he could make his contribution payments in installments rather than as a single lump-sum payment.

The August 13, 2015 email also offered MR a seat on Fango's board and named him Chief Financial Officer ("CFO") "[t]o allow [MR] to stay close to operations." The email stated that as CFO, "all banking transactions [would] need [MR's] signature or approval." MR testified he was offered the position of CFO because, as the sole investor in Fango, he had expressed an interest in tracking Fango's product development and monitoring how Fango's funds were being spent.

On August 14, 2015, a Fango employee circulated a revised operating agreement ("the Operating Agreement") that identified MR as CFO of Fango. The Operating

Agreement, which was later signed by Butler and MR, stated that as CFO, MR would "sign or approval [sic] all banking transactions." That same day, MR committed to purchasing 100,000 preferred membership units in Fango in return for his $50,000 investment commitment.

However, despite holding the title of CFO, MR had *no* access to Fango's financial records in practice. On August 17, 2015, Butler opened a bank account for Fango that listed *Butler* as the *sole* signatory and authorized user of Fango's funds. The day after the Fango bank account ("Fango account") was opened, Butler instructed MR to wire $10,000 from MR's personal bank account to the Fango account. MR recalled that Butler kept asking about the "status" of the transfer until the transaction was complete.

MR testified that all subsequent transfers were similarly "urgent." On September 1, 2015, Butler and another Fango employee met MR at a local hospital, where MR was being treated for a serious illness, and demanded MR pay $15,000 so they could fly to California to recruit celebrities for Fango. MR wired $15,000 to the Fango account that day but only after being escorted via wheelchair by Butler to a bank branch located in the hospital. On October 16, 2015, while MR was still recuperating, Appellants urgently demanded another transfer of $12,500, which MR paid. MR continued to meet Fango's demands and ultimately provided Fango $59,550 via personal checks and wire transfers documented in Fango account records. MR also testified to an undocumented cash payment of $500 paid to Butler, bringing his total investment to $60,050.

In addition to never being added as a signatory on the Fango bank account, MR testified he was never provided documents or spreadsheets showing how his money was

5

being spent. Therefore, MR was not able to approve day-to-day expenditures as initially agreed. MR asked Butler to provide documentation, but Butler never honored MR's requests. After the fourth request, MR testified that Butler provided him with a general "outline" of Fango's expenditure breakdown, which differed from original allocations promised in the Business Summary. For example, the new "outline" mentioned sales and marketing but also included a category for Butler's personal expenses. When MR inquired what "personal expenses" entailed, Butler provided vague responses which MR took to mean incidentals "like buying lunch or putting fuel in his vehicle." After Butler assured MR that he would get his money back because Fango would soon be profitable, MR relented on his requests for more details at that time.

MR then testified that he continued to ask Butler for the Fango account records after his investment was complete, but Butler told him the bank "could not" obtain the records. MR testified it was not until he brought the matter to the Enforcement Section—in April of 2021—that he was able to "get the bank records" by way of subpoena.

For his part, Butler testified he brought MR on as a member of Fango to "provide assistance with the finances" because MR had prior experience owning restaurants and closing deals with publishers and Butler claimed that MR simply failed to exercise his duties as CFO. Butler testified that MR never asked to have his name put on the Fango account and that in Butler's eyes, MR delegated the CFO duties to him.

Butler acknowledged that "not all" purchases made using the Fango account were business-related. He acknowledged "personal expenses" documented in Fango account bank statements, including; video game purchases, sports bets, on-demand videos,

6

gambling, bowling, movie tickets, *personal* stock trades, veterinary expenses, visits to bars and nightclubs, and *personal* legal fees for a DWI offense—none of which had anything to do with the purpose of the business or MR's investment in the business. The bank statements also showed $19,304.75 in cash withdrawals and fees that Butler never told MR about. All purchases were made by Butler between August 18, 2015, and June 17, 2016. The Fango account was closed on June 17th with a negative balance of $698.70.

Butler further acknowledged that Fango "didn't have any specific [written] contracts landed," though he claimed to have reached verbal agreements with four local St. Louis-area artists. Of those four artists, only one, JR, was listed as a targeted celebrity in the Business Summary. However, JR's participation was conditioned on a working mobile app and website, which Fango never produced.

To that end, Butler testified that $17,000 of MR's investment was used to pay AppNotch to develop a website for Fango. AppNotch's Chief Executive Officer was also a membership unit holder at Fango. Butler testified that at some point it became clear the technology "wasn't ready," so Butler made an agreement with AppNotch to stop working on the application and refund Fango $2,250 of the $17,000 payment. Butler cashed the refund received by Fango without telling MR.

Following the hearing and before the issuance of the Commissioner's Order, the parties submitted post-hearing briefs. In its post-hearing brief, the Enforcement Section declined to pursue six of the ten violations of section 409.5-501 alleged in the Petition and asked the Commissioner to enter judgment on the four remaining violations: (1)

7

"[Appellants] omitted to disclose the specific risks involved with the investment; (2) "[Appellants] misrepresented to MR how the investment funds were to be used;" (3) "[Appellants] misrepresented to MR that he would start seeing a return on his investment in four months;" and (4) "[Appellants] falsely promised MR that he would be CFO."

In their post-hearing brief, Appellants raised three arguments against the Petition: (1) that it was untimely under the statute of limitations supplied by section 409.5-509(j)[4]; (2) that MR's contract to purchase membership units in Fango was not a security under section 409.1-102(28); and (3) that Appellants did not commit any fraud for which they could be held liable under section 409.5-501.

The Order squarely addressed all three arguments raised by Appellants in their post-petition brief. First, the Commissioner determined that section 409.5-509(j) does not bar the Petition because section 409.5-509(j) is inapplicable to administrative actions brought under section 409.6-604. And, though not raised by Appellants, the Commissioner also determined that the "the Petition was brought within a reasonable time period from the time the misconduct occurred" under section 409.6-604. Second, the Commissioner determined that the "instruments purchased by MR in the Agreement" constitute a security under section 409.1-102(28)(E); because "they clearly meet the definition of an investment contract."

Third, the Commissioner determined that the Enforcement Section proved its case with respect to three of the four remaining fraud violations under section 409.5-501.

---

[4] Appellants post-hearing brief cited to section 409.5-509(f), but the five-year limitation referenced in their argument in contained in section 409.5-509(j).

8

Specifically, the Commissioner found that Appellants "misrepresented to MR how the investment funds were to be used," "falsely promised MR that he would function as CFO," and "misrepresented to MR that he would be seeing a return on his investment within four months."

As to the misuse of funds, the Commissioner determined that only $22,640.49 of MR's total investment was "used in furtherance of Fango's business development." The Commissioner credited the net amount allocated to AppNotch as well as flight fares and other expenses associated with a business trip taken by Butler and another Fango employee to California after they demanded money from MR at the hospital in September of 2015. The Commissioner determined that MR's remaining investment of $37,408.51 was "improperly used by Butler on personal expenses," with the bank records reflecting that $7,766.68 was "spent clearly on personal expenses by Butler;" another $19,304.75 in cash withdrawals and fees; and $13,782.77 "spent on food, drink, gas, bowling, and other activities in the St. Louis area."

On the issue of MR's CFO appointment, the Commissioner determined that Appellants agreed "both orally and in the Agreement" that MR would function as CFO but that despite this inducement, his role as CFO "never came to fruition."

Finally, the Commissioner determined that Appellants represented to MR through email and in the Business Summary that Fango would receive a return on investment within 120 days; that Butler did not make any statement or action dispelling that representation; and that "not only did Fango not see a profit within 120 days, Fango never received revenue from any source other than the investment funds of MR."

9

The Commissioner noted that "[t]he testimony of MR and [the Enforcement Section's investigator] was competent and credible. The testimony of Butler was largely in sync with the testimony of MR, and where it differs the Commissioner finds MR's testimony to be compelling and Butler's less credible."

Appellants filed a notice of appeal with the Commissioner and a petition for judicial review in the circuit court. The circuit court affirmed the Commissioner's Order, determining that the Petition was not time-barred, that MR's interest in Fango was a security, and that the Commissioner's findings of facts and conclusions of law underlying the three violations of section 409.5-501 were supported by the evidence in the record. Appellants then timely appealed the circuit court's judgment, raising three points on appeal.

**Standard of Review**

When a party appeals from a circuit court's judgment reviewing an agency's decision in a contested case, the appellate court does not review the circuit court's decision, but rather the agency decision. *Ferry v. Bd. of Educ. of Jefferson City Pub. Sch. Dist.*, 641 S.W.3d 203, 206 (Mo. banc 2022) (citing *Mo. Real Estate Appraisers Comm'n v. Funk*, 492 S.W.3d 586, 592 (Mo. banc 2016)). The reviewing court must determine whether the agency decision is authorized by law and supported by competent and substantial evidence upon the whole record. *Id.* (citing MO. CONST. art. V, § 18). In making this determination, the reviewing court "must consider all of the evidence that was before the agency and all of the reasonable inferences that may be drawn from that evidence, including the evidence and inferences that the agency rejected in making its

10

findings." *Id.* (citing *Seck v. Mo. Dep't of Transp.*, 434 S.W.3d 74, 79 (Mo. banc 2014)) (internal quotation mark and emphasis omitted). The reviewing court may not "substitute its judgment for that of the administrative agency being reviewed, make findings or conclusions in the first instance, or ascribe to the agency findings and conclusion it did not make." *Id.* (citing *Treasurer of State v. Parker*, 622 S.W.3d 178, 183 (Mo. banc 2021)) (internal quotation marks and citation omitted).

For ease of clarity, we address the points on appeal out of order.

## Point I

In his first point on appeal, Appellants argue that the Commissioner erred in concluding the Petition was not time-barred.

## Analysis

At the agency level, Appellants argued the Petition was time-barred because section 409.5-509(j) provides that a person may not obtain relief for misrepresentations made in connection with the sale of a security "unless the action is instituted within the earlier of two years after discovery of the facts constituting the violation or five years after the violation." However, just as the Commissioner explained in the Order, section 409.5-509(j) is applicable only to civil actions brought by the *purchaser* of a security against the seller and is *inapplicable* to administrative petitions brought by the Enforcement Section under section 409.6-604. *State ex rel. Lavender Farms, LLC v. Ashcroft*, 558 S.W.3d 88, 91 (Mo. App. W.D. 2018) ("It is clear that the Enforcement Section does not fall under [section 409.5-509(j)] because it is not a 'purchaser' of the security.").

11

Thus, the Petition here cannot be rendered untimely by section 409.5-509(j). In fact, no provision of section 409.6-604 or Missouri's generally applicable statutes of limitations would render the Petition untimely. *Id.* at 91 ("The Enforcement Section brought the Administrative Action under section 409.6-604. Section 409.6-604 applies only to administrative actions and includes no statute of limitations or repose that applies to this case[.]"); *Brady v. Ashcroft*, 643 S.W.3d 565, 581 (Mo. App. W.D. 2022) ("We conclude that the statutes of limitation found in §§ 516.380, .390, and .400 do not apply to the Enforcement Section's administrative enforcement petition. Brady has not cited this Court to any case in which a statute of limitations found in chapter 516 of the Revised Statutes of Missouri has been applied to an administrative proceeding, and we are aware of none.").

That said, the absence of an applicable statute of limitations does not allow for the Enforcement Section to bring an administrative enforcement petition at *any* time; it must still be brought within a *reasonable* length of time. *Patterson v. State Bd. of Optometry*, 668 S.W.2d 240, 244 (Mo. App. E.D. 1984) ("Appellant is correct in that no statute of limitations applies to the board's cause of action at bar. Since there is no applicable statute, we look to the board's action to determine if it was an unreasonable length of time . . .").

On appeal, Appellants have abandoned their previous argument citing section 409.5-509(j). They now contend that the Petition was untimely because it was not brought within a reasonable time of the alleged misconduct. Although this argument was not raised by Appellants before the agency, the Order nonetheless addressed it and

12

concluded that the Petition was brought within a reasonable time under the circumstances. We need not address whether the Commissioner's gratuitous comment in the administrative decision that "the Petition was brought within a reasonable time period from the time the misconduct occurred" serves to preserve an otherwise unpreserved issue relating to whether or not the Petition was time barred because we agree with the Commissioner's conclusion in that regard.

Here, the specific circumstances of this case included: evidence of fraudulent concealment of the truth of what Butler was doing with MR's cash investment; MR's significant illness; MR's mistaken belief at all times that Butler was not being untruthful to him and that he was going to receive his investment with profit back eventually; and no suggestion that Appellants have been harmed by any delay in the filing of the Petition. Under these circumstances, the time within which the Petition was brought was not unreasonable. Further, Appellants have cited no precedent concluding otherwise in similar circumstances.

Point I is denied.

## Point III

In Point III, Appellants claim each of the three findings that Appellants violated section 409.5-501 are not supported by competent and substantial evidence on the whole record. We disagree—the *overwhelming* evidence of the record supports the Commissioner's findings and conclusions underlying all three violations.

**Analysis**

It is unlawful for a person, in connection with the offer, sale, or purchase of security, directly or indirectly:

(1) To employ a device, scheme or artifice to defraud;
(2) To make an untrue statement of material fact or to omit to state a material fact necessary in order to make the statement made, in the light of the circumstances under which it is made, not misleading; or
(3) To engage in an act, practice, or course of business that operates or would operate as fraud or deceit upon another person.

§ 409.5-501.

The Commissioner concluded that Appellants violated section 409.5-501 when they promised MR that he would serve as CFO of Fango, a role that would provide MR complete access to Fango's financial records at all times and the exclusive power to authorize expenses from Fango's bank account under the terms of the Operating Agreement. The Commissioner found that—despite MR's nominal title as CFO—MR was never actually given access to Fango's bank statements or any opportunity to control Fango's expenses and that *Butler* actually controlled Fango's spending as the *sole* person authorized to use Fango's bank account. Appellants do not challenge the accuracy of these findings but instead claim the cited promises were not misrepresentations or made with fraudulent intent because—at the time the promises were made—it was intended that MR exercise the CFO's powers. Appellants contend the evidence shows that MR simply failed to perform his role as CFO and that he used his discretion as CFO to delegate his duties to Butler.

14

The evidence belies Appellants' claims. When MR made his contributions to Fango, the money was wired directly to an account that was opened by Butler and listed Butler as the sole authorized user. Even though Butler was explicitly required to get MR's signed authorization to use the funds in the Fango account under the terms of the Operating Agreement, Butler *never* removed himself as an authorized user and *never* insisted on placing MR on the account. Instead, Fango's bank records showed a sustained pattern of daily transactions by Butler—without prior approval from MR. Butler provided no evidence to suggest that any of these expenses were pre-approved by MR or that he even attempted to seek out MR's approval after the fact. From the beginning, Butler had complete control over the Fango account—and he exercised that control as he pleased—even though the Operating Agreement expressly stated that Butler would need MR's signed authorization on all expenses. In so doing, Butler misappropriated Fango's cash account for his *personal* expenses—including *personal* stock transactions, *personal* attorney's fees for his DWI charge, *personal* veterinary expenses for his pet, and even *personal* expenses for bowling activities having nothing to do with Fango's business purposes.

Additionally, the evidence provides clear inferences that MR did not simply delegate his promised roles to Butler but that Butler actively interfered with MR's efforts to perform his role as CFO. On the occasions Butler went to MR to request additional funds be put into the Fango account, including when MR was hospitalized and wheelchair-bound, Butler never explained the breakdown of how the requested funds would be spent or provided documentation to support his requests. Instead, he insisted

that the funds were needed to pay for "urgent" expenses if Fango was ever going to return a profit. Given MR's lack of experience with managing any business other than a restaurant, lack of access to Fango's records, and lack of information surrounding the demanded expenses, Butler's emergency requests left MR incapable of making informed decisions about whether the requested expenses were actually justified—the essential responsibility he was promised when he was named CFO.

Furthermore, when MR asked Butler—the only person identified as an owner on the Fango account—to provide him the Fango account records so that MR could review Fango's expenses, Butler stalled getting the records for MR and instead provided a homemade "outline" that broke down the amount of spending going into various expense categories without itemizing the transactions themselves. When MR persisted in requesting the records and specifically asked why he had not yet received them, Butler misrepresented that the bank could not provide him the records because they were unavailable. Despite this claim, the bank *was* able to provide those records to the Enforcement Section in 2021, years after MR's requests. Because Butler never provided these records, MR never learned precisely how his contributions were being spent while he was an investor with Fango.

The Commissioner's conclusion that Appellants did not honor their promises that MR would serve as CFO and exercise his powers to monitor his investment and control Fango's spending is substantially and competently supported by the whole record.

The Commissioner also concluded Appellants violated section 409.5-501 when they represented to MR in the Business Summary that the entirety of MR's contribution

16

would be used for developing Fango's business. After reviewing all Fango account records, the Commissioner determined Butler misappropriated $37,048.51 to fund his own personal expenses—which he clearly did.

Butler does not contest that the Business Summary unambiguously represented MR's entire investment would go to developing Fango's business and allocated *nothing* for Butler's personal expenses. Nor does Butler contest any part of the Commissioner's conclusion that he used $37,048.51 of MR's contribution to fund his own personal expenses. Rather, Butler contends MR *ratified* his personal expenses by approving the vague "outline" of expenditures—created by Butler in response to MR's repeated requests for Fango account records—especially with regard to any "personal expenses" for Butler.

MR admits he did approve the "outline" but only because he thought the category of personal expenses referred to personal expenses incidental to legitimate business activity. MR reasonably claims he would have objected to many of Butler's transactions if he had known their true character—especially personal expenses for stock transactions, DWI attorney's fees, veterinary expenses, and bowling alley expenses. Additionally, MR testified that he approved these expenses only after Butler provided the "outline," not at the time the Operating Agreement was signed by MR. The additional category of personal expenses contained in the outline clearly contradicted the representations made in the Business Summary, which allocated the entirety of MR's contribution to Fango's development and left nothing for Butler's personal expenses.

In resolving the disputed evidence, the Commissioner credited MR's testimony over Butler's, and we must defer to this determination. Given the sheer amount of obviously personal expenses charged to the Fango account and Butler's previously discussed efforts to prevent MR from accessing the account's incriminating record of transactions, the Commissioner's conclusions that Appellants misrepresented how MR's funds would be used at the time the membership shares were purchased and that Butler misappropriated $37,048.51 for his personal use are both supported by competent and substantial evidence of the whole record.

Finally, the Commissioner concluded that Appellants violated section 409.5-501 when they represented to MR that Fango expected to generate revenue through its App within 120 days of MR's full investment and that some of the revenue would be returned to MR as profit. Appellants do not deny making this representation but assert it cannot be considered a misrepresentation, or in any way fraudulent, because it was merely a projection that did not amount to a guarantee or a promise that Fango would actually begin generating revenue within 120 days of the investment.

Securities regulations have long recognized that projections of performance can constitute misrepresentation if they are made without a reasonable basis in fact:

> A broker-dealer cannot avoid responsibility for unfounded statements of a deceptive nature, recklessly made, merely by characterizing them as opinion or predictions or by presenting them in the guise of a probability of possibility. . . . .
>
> Groundless opinions come within the ambit of false or misleading statements prohibited by the securities laws. "The expression of opinion, coupled with other statements, may amount to a statement of material fact,

18

although it is disguised and framed technically to be nothing more than a mere opinion."

*In re Alexander Reid & Co., Inc.*, 40 S.E.C 986 (Feb. 8, 1962) (citing *S.E.C. v. Okin*, 137 F.2d 862, 864 (2d Cir. 1943) ("This admission shows that the opinion was groundless; in other words, the statement of it even as an opinion was false or misleading.")); *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1277 (D.C. Cir. 1994) (collecting cases recognizing that "projections and statements of optimism are false and misleading for the purposes of the securities laws if they were issued without good faith or lacked a reasonable basis when made").

When making the specific projection that Fango would be generating revenue within 120 days of MR's contribution, Appellants effectively represented to MR that Fango had made significant progress towards its development objectives and only needed a little more time and money to begin executing its business plan.

At the time Appellants presented the projection to MR, however, technical development of the Fango App had not yet begun in *any* capacity and Appellants had not secured *any* contracts with celebrities to join Fango. Both of these steps were necessary components of Fango's business model, which planned to generate revenue from subscriptions to its celebrity-focused App. Given the complete lack of progress towards these objectives, Appellants either knew or reasonably should have known they had no basis to project that Fango would begin generating revenue within 120 days of receiving Butler's contribution.

Thus, the Commissioner's conclusions that this projection was baseless and made for the purpose of inducing MR to invest by misrepresenting Fango's implied development, constituting a violation of section 409.5-501, are supported by the competent, substantial evidence of the whole record.

Point III is denied.

## Point II

In Point II, Butler argues the Commissioner erred in concluding that MR's contract to purchase membership shares in Fango was an investment contract subject to Missouri's securities regulations.

## Analysis

Under Missouri law, the definition of a security includes "as an 'investment contract' an investment in a common enterprise with the expectation of profits to be derived primarily from the efforts of a person other than the investor . . . ." § 409.1-102(28)(D); *see also S.E.C. v. W.J. Howey Co.*, 328 U.S. 293, 298 (1946). Missouri law expressly recognizes that "an interest in . . . a limited liability company . . ." may be considered a security if it meets the definition of an investment contract. § 409.1-102(28)(E).

The Missouri definition of an investment contract mirrors the definition under federal securities law: "The Missouri Securities Act of 2003 is patterned after the Uniform Securities Act." *Brady v. Ashcroft*, 643 S.W.3d at 574; UNIF. SEC. ACT § 102 cmt. n.28 (2002) ("Much of the definition in Section 102(28) . . . is identical to the definition in Section 2(a)(1) of the Securities Act. State courts interpreting the Uniform

20

Securities Act definition of security have often looked to interpretations of the federal definition of security.").  Thus, the Missouri definition of security embraces the broad, functionalist definition adopted by federal law:

> [W]e are guided by the familiar canon of statutory construction that remedial legislation should be construed broadly to effectuate its purposes. The Securities Exchange Act quite clearly falls into the category of remedial legislation. . . . [W]e are reminded that, in searching for the meaning and scope of the word 'security' in the Act, form should be disregarded for substance and the emphasis should be on economic reality.

*Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967) (citing *Howey*, 328 U.S. at 298); *see also Reves v. Ernst & Young*, 494 U.S. 56, 61 (1990) ("Congress' purpose in enacting the securities laws was to regulate *investments*, in whatever form they are made and by whatever name they are called.")

Butler first asserts—without any further explanation—that MR's investment did not satisfy the common enterprise element.  Section 409.1-102(28)(D) explains that the common enterprise element is satisfied when "the fortunes of the investor are interwoven with those of either the person offering the investment, a third party or other investors[.]"  Here, both MR and Butler would only see a return if Fango proved successful and began generating revenue; therefore, their fortunes were both tied to Butler's success in making Fango a profitable business.  The record contains competent and substantial evidence supporting the conclusion that MR's interest in Fango satisfies the common enterprise element for an investment contract.

Butler also argues that MR did not have an expectation of profits because MR was warned that Fango was a risky enterprise and might not return a profit.  In determining

21

whether an investor had an expectation of profits, the operative question is not whether the investor believed receiving a profit was a guaranteed or likely outcome but rather whether the investor was motivated to provide the capital contribution in the hopes of eventually seeing a return on investment. *See United Hous. Found., Inc. v. Forman*, 421 U.S. 837, 852-53 (1975) (citations omitted) ("By profits, the Court has meant either capital appreciation resulting from the development of the initial investment . . . or a participation in earnings resulting from the use of investors' funds . . . . In such cases the investor is 'attracted solely by the prospects of a return' on his investment. By contrast, when a purchaser is motivated by a desire to use or consume the item purchased . . . the securities laws do not apply.").

The mere fact that a return is not guaranteed does not defeat an investor's expectation of profit; in fact, instruments that do not guarantee a profit and pose a risk of loss are *more likely* to be considered securities. *See Reves*, 494 U.S. at 67 ("Finally, we examine whether some factor . . . significantly reduces the risk of the instrument, thereby rendering application of the Securities Acts unnecessary.").

When MR was first approached about Fango, he was provided a business plan that explained Fango was "seeking a $50,000 *investment.*" Furthermore, the Business Plan expressly promised potential profits in exchange for the capital contribution: "The *returns for this investment could be very attractive* when the company is able to execute it business plan." Additionally, MR was promised that his contribution would immediately begin accruing a return-on-investment balance if he invested in Fango: "[Y]our Preferred Class A shares shall accrue a 7% interest until such time as your

Preferred Class A shares have been converted to Common Class A Shares as a result of the return of your investment plus interest." MR testified that these representations induced him to make his contribution to Fango, believing Fango would soon become a successful company that would return him a profit for his investment. The record shows MR contributed to Fango because of his expectations of profit.

Finally, Butler argues that MR, who was named CFO and a board member in the Operating Agreement, was not a passive investor but rather an active partner in Fango and that MR, therefore, was not relying primarily on the efforts of others to return a profit. When an investor in a business retains meaningful power to control the business, courts will find that the investor's interest is not an investment contract subject to securities regulations. *Williamson v. Tucker*, 645 F.2d 404, 422 (5th Cir. 1981) ("The issue . . . is whether meaningful powers possessed by the venturers under the joint venture agreements are enough to preclude as a matter of law a finding that the venture interests were securities. . . . . Insofar as the power retained by the investors is a real one which they are in fact capable of exercising, courts have uniformly refused to find securities in such cases."). When determining the powers held by investors, courts do not rely solely on the powers nominally held by the investor but also consider the practical reality of the investor's position to exercise those powers, including the sophistication of the investor:

> [I]n order to effectuate the purposes of the Uniform Securities Act, examination of the totality of the circumstances surrounding the transaction is required in order to determine if the investors of risk capital have, in fact, retained a realistic ability to participate in significant managerial decisions

of the enterprise or if they have relinquished in practical reality, actual control of the enterprise to others.

*State v. Kramer*, 804 S.W.2d 845, 848 (Mo. App. E.D. 1991); *Williamson*, 645 F.2d at 424 ("A general partnership or joint venture interest can be designated a security if the investor can establish, for example, that (1) an agreement among the parties leaves so little power in the hands of the partner or venturer that the arrangement in fact distributes power as would a limited partnership; or (2) the partner or venturer is so inexperienced and unknowledgeable in business affairs that he is incapable of intelligently exercising his partnership or venture powers; or (3) the partner or venturer is so dependent on some unique entrepreneurial or managerial ability of the promoter or manager that he cannot replace the manager of the enterprise or otherwise exercise meaningful partnership or venture powers.")

Although the Operating Agreement named MR as CFO and nominally provided him near complete control over Fango's finances, the terms of the Operating Agreement were clearly not honored in practice, as evidenced above, and MR never actually held the power he was promised. Furthermore, even though MR was an experienced businessman who had managed a restaurant, no evidence suggests he had any experience managing a business similar to Fango—a social media start-up. Given MR's inexperience and the indispensability of Butler's purported expertise and celebrity contacts to executing Fango's ill-fated business plan, MR had little choice but to accede to Butler's demands even though he was promised control over Fango's finances. Thus, despite the terms of the Operating Agreement, MR's lack of relevant experience and exercisable power left

him entirely dependent on the efforts of others to realize a profit, namely Butler—the same individual who used *business* resources over and over again for his *personal* gain.

Point II is denied.

## Conclusion

The judgment of the circuit court affirming the decision of the Commissioner is affirmed.

_____
Mark D. Pfeiffer, Judge

Edward R. Ardini, Jr., Presiding Judge, Cynthia Martin, Judge, concur.

25